Curia, per Richardson, J.
This case depends upon the statute of 1 James 1, c. 11, 2 Stat. 508, to make it a felony to marry a second husband or wife, until the former be dead.
The commission of the felony, (bigamy,) as a fact, is not disputed. Scion Barefoot, the defendant, first intermarried, seven years ago, with Zilpha Futel, a widow. Both the parties were of lawful age, he about 22 years of age, and Zilpha much older.
In June last, while Zilpha was still living, Barefoot again intermarried with Elizabeth Odum, a single woman, also of lawful age. The ceremony and rite of marriage was administered in both instances by clergymen, the first by the Rev. John A. Russel of the reformed Methodist Church, the second by the Rev. Jacob .Higgins of the Baptist Church. Both the marriages were solemnized in Richland district in due form, and in presence of witnesses.
Thus, then, there was a second woman taken to wife, while the first wife yet lived. This second marriage of the defendant consummated the crime of bigamy, unless the defence, now to be considered, can exempt him from punishment. It turns mainly upon what is the proper construction of the Stat. 32 Henry 8, 2 Stat. 475. The defence of Barefoot consists in this. Zilpha Futel, the first wife, was his aunt, by consanguinity, that is, his *221 mother’s sister. And although cohabitation with his mother’s sister constitutes the sin of incest, in morality and revealed religion, yet that high offence against good morals so operates as to render the first marriage utterly void, and of no effect. That is to say, makes it no more than a mere vicious cohabitation between the defendant and his aunt. Or the argument may be thus stated — as in England the Ecclesiastical Court might set aside the first marriage, this court ought to assume such a divorce, because we have no Ecclesiastical Court to enforce the statute. And thus the first marriage being merely ostensible, it is argued that the defendant intermarried lawfully with Elizabeth Odum, and she, not Zilpha, is his true wife; or assuming such a divorce, the defendant is equally guiltless of bigamy. Such is the defence.
And true it is, if the first marriage had been thus absolutely void in Jaw, as if a boy under 14 and a girl under 12 years of age had passed through the form and ceremony of marriage, such would be the inconsequential operation and effect, and the second marriage of either, when of lawful age, and to another person, would not constitute bigamy.
But the proposition, that the marriage of Barefoot to his aunt was this legal nullity, is an assumption of the very point and pivot of his whole defence. Once make such a postulate good, and he goes clear of bigamy.
But if the argument and law fail to prove that the first marriage was void, then, it is equally plain that the defendant has been properly and lawfully convicted, and he cannot escape legal punishment, by the fact that his first marriage was incestuous. Now, then, laying aside the striking inconsistency of a man offering to’ defend himself by insisting that the first marriage was intrinsically immoral and sinful, and therefore a nullity, in order to arrest the criminal consequences and. legal punishment of bigamy — laying this inconsistency aside, let us see how the laws of the country stand in relation to the marriage of a nephew with his aunt.
Is it a marriage binding by law on the husband and wife, so as to make their offspring legitimate children, and *222 prevent their contracting a second marriage during the ' joint lives of such husband and wife ? Such is the question.
By the common law, single-men and women, being of the lawful age, that is, men of 14 and women of 12 years of age, are left free to enter into the contract of marriage at their own discretion.
“Our law,” says Blackstone, 1 Com. 432, “considers marriage in no other light than as a civil contract.” “The law treats it,” hescontinues, “as it does all other contracts, allowing it to be good and valid in ail cases where the parties at the time of making it were, in the first place, willing to contract; secondly, able to contract; and lastly, did contract, in the proper forms and solemnities required by law.”
All the common law writers on marriage lay down the same law, and in almost the same terms. See 2 Steph. Com. 279; Shelford on marriage and divorce, and Poynter on the same.
These writers are named for examples of the rest, and as jurists who have collected the cases, and digested the laws of marriage, and I know of no essential difference in those writers upon the right to marry, or of the permanence of the contract,.or of its consequence in utterly excluding a second marriage during the joint lives of the husband and wife.
But the authorities will be more particularly named, and subjoined at the end of this decision.
I need not consider the right of divorce, or the few exceptions to this general right of men and women to intermarry, and to be bound for life in vinculo matrimonii; it is a chain, so far as being bound to rational happiness at home, and regard for human order everywhere, can be so called. Its necessity and usefulness constitute its chain, continuity and durability.
Only one exception is presented, by the case before the court, namely,. does the proximity of blood between a nephew and his aunt render their marriage a nullity by our laws, so as to let in the second marriage of Barefoot to Miss Odum, and render it a legal contract of marriage 1 *223 This would protect him from the charge of bigamy, by making him the lawful husband of Elizabeth in place of Zilpha.
I will not enter upon all the views, considerations and policy presented by the defendant’s counsel, in his earnest argument, that the law ought to hold an incestuous marriage as a mere meretricious sexual cohabitation, and utterly void as a marriage contract. And it may be well deplored that a legislative Act has not been passed to reform the common law in this respect, as has been lately done in Great Britain, and such incestuous marriages declared to be utterly null and void, if contracted after the statute.
But what is asked of this court ? It is to do more, as I apprehend, than the Legislature could do — impair the obligations of past contracts — and more than the English ■ Parliament has done, by the statute referred to ; — the court is to declare null and void a marriage' already solemnized and binding at common law. And that, too, is to be done in order to shield the guilty. It will be seen at once that any such judicial act would be retrospective, and annul past marriages, and consequently would be attended by the bastardizing of the children of such marriages, and would at the same time take from such husbands their only legitimate children.
Reflect for a moment upon such consequences, of this court’s undertaking to set aside such marriages as null and void. The father would lose all right to his only offspring, which in law can be no other than the children of his wife, and the children would equally lose their father, and become filii nullius or bastards.
Have not the unborn children, and the public too, their rights in every marriage.? Children are plainly a third party to marriages, and demand its permanency. Yet let such an Act as the English statute be passed, by all means, but let it be prospective, and relate not to past but future marriages. The marriage which the law permitted at the time of its solemnization, must not be nullified, even by the Legislature, by any ex post facto law, and still less by the decision of a court.
*224 The immediate parties may deserve punishment, but their offspring have rights that must be protected.
I have presented this brief forecast of the consequences of a court’s undertaking to give a new construction to the 32 Henry 8th, upon the ground of the immorality and ir-religión of incestuous marriages, and because this State has no Ecclesiastical court to restrain and punish the incestuous husband and wife, pro salute animes. And I would point out the just considerations — not to say the necessity, of the established and well recognised construction so often put upon the statute by common law courts, to wit: that the statute was made to restrict divorces by the Ecclesiastical court, and confine them to marriages within the third degree of consanguity or affinity, but not to nulify any marriage otherwise than by the sentence of such Ecclesiastical court.
The statute of Henry 8, and that of James 1, are too long to be here transcribed, but they ought to be read by those who doubt. They give the proper understanding of the laws of marriage, and the very learned and able compiler of our Acts and Statutes subjoins this note to them. “In this State marriage is a civil contract of mutual partnership and personal cohabitation during life, under the provisions of the laws passed on this subject. The parties are, the man, the woman, and the State. The State is. interested that the contract shall be fulfilled beneficially for the progeny, of whom the future citizens are to be composed. The contract in South Carolina is held to be indissoluble from whatever cause but death, no divorce a vinculo ma-trimonii ever having been granted in South Carolina. Vaigneur et al. vs. Kirk, (See 2 Eq. Rep. 644, note.') Many theoretical objections of a very grave character may be made against this State doctrine, but as yet it appears to work well, and there is no ground from past experience to justify any change in the received law on the subject.” 2 Stat. 733.
The statute was passed by Henry the 8th, the first royal reformer of the Christian religion in Great Britain, for the purpose of restricting the Ecclesiastical courts that had grown up under the pontifical power, from setting aside *225 marriages by reason of blood or affinity. If I remember aright, those courts had divorced man and wife related in the seventh degree of consanguity and fourth of affinity. At this crisis the statute interposed, and restrained such ecclesiastical divorces to the Levitical law of the old testament of the Christian bible, that is, to the third degree of consanguinity or affinity.
The statute thus restricts and limits the practice of divorcing man and wife that had crept in, but gives no new power even to those courts, and none whatever to other courts. How then can we either hold the first marriage void, or assume an ecclesiastical divorce ? What authority has this court to interpose at all 1 None whatever, but to punish the bigamy, and thus virtually reprove the incest, which can be reached by the court in no other way.
But there remains one legal view urged by the counsel, upon which he relies so much, that for general satisfaction I must notice it. _ It is this, that vicious and immoral contracts are absolutely void in their very inception. And he would apply this rule of law to vicious marriages. If he had applied it to a mere betrothment, promise, or engagement, as between aunt and nephew, to enter into such a marriage, his law would have been unanswerable. But all the law adduced, applies only to executory and not to executed contracts.
Such law is to estop and prevent the practical enforcement of such contracts. But when they become practically performed and executed, the parties are in pari delicto, in equal practical guilt. Accordingly, the law, as it could not prevent the mischief, leaves the parties as it found them. In pari delicto potior est conditio possidentis, is then the rule of law. In that case the parties, as individ-als, have tied themselves up, not by note or bond, but by acting and carrying out the contract to completion, and nothing remains but to punish them, if such actual execution of the contract amount to a crime.
This is the very position of Barefoot; he did the misdeed; the contract of marriage was not executory, but executed, and then it was no longer, as lawyers say, in posse, to be *226 set aside, but stood in esse, and therefore irremediable and not to be sundered.
Let me take for illustration the very cases quoted by the defendant’s counsel. “A bond to compound a perjury is void,” 2 Wils. 341. So of a note given for a vicious consideration. Fonblanque, B. 1, ch. 4, sec. 10. “Marriage brokage bonds and the like, are void.” But suppose for a moment that note, or that bond, to compound perjury, or that marriage brokage bond, had been voluntarily paid, could the money have been recovered back 1 Never unless induced by fraud. The locus poenitentice would have passed away, and both parties being in pari delicto, neither could have advantage from his own misdeed and recover back the money.
It is easy then, to see the inefficiency of this colorable argument, and the total inapplicability of the cases adduced. They apply only to executory, not to executed contracts. '
Again; the counsel quoting from Shelford says, “a wife may stand by and see her husband married to another, and yet assert her rights,” (to him of course.) Then Zil-pha might have witnessed the marriage to Elizabeth, and yet even then claimed her husband Barefoot. Why 1 Because her marriage being binding at first, can in no way be set aside by a subsequent fraud. The case of impotency is quoted as one of which either party may take advantage. Assuredly, because, whatever the ceremony, there never was a practical, executed, marriage. It could only amount to a promise or betrothment, a mere executo-ry thing, but in fact, as harmless and foreign to an executed contract of marriage, as kissing an infant that the good couple, so betrothed, choose to adopt in full form and call “our baby,” would be from making them the true parents.
In a word, if I may use the expression, the ceremonial law of marriage makes up the necessary extrinsic evidence of its contract, but if on account, of impotentiam, it cannot be executed, the ceremony is vain.
Setting aside a marriage for impotency is, therefore, but shewing that there never could have been any maniage. Impotency rendered the execution impossible.
*227 What is the meaning of the words “able to contract,” just quoted from Blackstone 1 They mean mentally and corporeally able to contract — hábiles ad matrimonium. Why may not a child, hermaphrodite, or eunuch, contract binding marriages 1 Plainly for the same reason. Such instances illustrate well what are the .kind of marriages absolutely void in law, and what is meant by the terms — * 1st. Willing to contract. 2d. Able to contract, and 3d. Actually contracting in due form, which bind such parties in marriage, notwithstanding mere canonical disabilities of consanguinity or affinity.
It is possible that I may not have justified to all understandings the common construction of the statute, but that construction has been too often recognised to be now disregarded. It is, to my own mind, the unavoidable construction, and I' would willingly overcome the earnest convictions and conscientious scruples of the counsel, who I am persuaded, labored, not so much for the rescue oí the defendant, as to shield the rite of marriage from the tarnish of incest. But in his zeal he overlooks the great end of marriage, permanency in its union, from humanity and gratitude to woman, and for justice and faith to legitimate oflspring.
I have but to add, that the authorities for this construction of the statute are as many and as uniform, and without a single counter adjudication, as those before noticed upon the common law rite of marriage. But as the precise question has not been decided in this State, and there may be deep feelings enlisted in the case, and probably general expectation — such considerations induce me to refer to the many authorities which bear upon the question made by the defendant’s appeal, and which under different circumstances might be deemed superfluous.
The authorities relied on are as follows.
As to consanguinity rendering a marriage voidable, and not ipso facto void, see 1 Bl. Com. 434-5. The impediment of. consanguinity renders the marriage voidable, not void. Poynt. on Mar. and Div. 85.
Same point — Shelf, on Mar. and Divorce, 154.
Same point — East P. C. 466.
*228 As to an indictment for bigamy being sustainable when the first marriage was within the Levitical degrees (and therefore merely voidable,) see Archbold’s Cr. PI. 477 ; 3 Inst. 88.
Proximity of relationship, says Stephens, was till very lately a canonical and not a civil disability; 2 Steph. Com. 284.
In England, says Roscoe, (Cr. Ev. 286,) incestuous marriages are not void, but only voidable during the lives of the parties ; and if not so avoided, are to all intents valid.
A first marriage de facto, subsisting in fact at the time of the second marriage, is sufficient to bring a case within the Act (1 James 1,) though such first marriage be voidable by reason of consanguinity, affinity, or the like; for it is a marriage in judgment of law, until it is avoided ; 1 Russ, on Cr. 290.
“Though a lawful canonical marriage need not be proved, yet a marriage in fact (whether regular or not) must be shewn.” 10 East R. 287, note to the case of the King vs. The Inhabitants of Brampton.
At common law, a marriage between aunt and nephew is not void, it can only be avoided in the Ecclesiastical Court. The canonical disabilities being entirely the province of ecclesiastical law, the books of the common law are nearly silent concerning them; 2 Steph. Com. 281. See also 9 Penny Cyclop. 39, Tit. Divorce; Shelf, on Mar. and Div. 154.
“The incapacity in respect of proximity of relationship, was till very lately a canonical only and not a civil disa-ability,” 2 Steph. Com. 285.
“By the stat. 5 and 6 W. 4, c. 54, passed in 1835, all marriages thereafter celebrated between persons within the prohibited degrees of consanguinity or affinity, shall be absolutely void to all purposes whatever ; which seems to bring the objection within the cognizance of the courts of common law.” But this English statute is not of force in South Carolina.
As to canonical and civil disabilities, see Shelf, on Mar. and Div. 154. “The canonical disabilities only make the marriage voidable.”
*229 New statute as to marriages withiu the prohibited degrees, Shelf. 155, 179. Before this Act, these marriages were only voidable, and not void. See Shelf, and 14 Penny Cyclo. 442, tit. Marriage, for the most clear and condensed account of the law relative to marriages in England before the 5 and 6 W. 4, c. 54, in 1835. See the construction of the stat. of 5 and 6 W. 4, c. 54, Shelf. 179.
Por a popular and useful summary of laws on marriages, ancient and modern, religious and civil, barbarous and civilized, see Rees’ Cyclop, art. Marriage, 23d vol.
Upon such authorities the case is too clear for doubt.
The motion for a new trial is therefore unanimously dismissed.
O’Neall, Evaws, Butler, Wardlaw and Frost, JJ. concurred.